# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

## CIVIL NO.  1:07CV115

| | |
|---|---|
| JOHNNY R. MICHAEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | **MEMORANDUM** |
| _____) | **AND ORDER** |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security Administration, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**THIS MATTER** is before the Court on the parties' cross motions for

summary judgment.  For the reasons stated herein, the Defendant's motion

is granted and the Plaintiff's motion is denied.

## I.  STANDARD OF REVIEW

This Court does not conduct a *de novo* review of the decision of the

Administrative Law Judge (ALJ).[1]  In fact, under the statutory scheme of

_____

[1] The Social Security Act consists of two benefit programs. The
Social Security Disability Insurance Program (SSDI), established under
Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to
disabled persons who have contributed to the program while actively

the Social Security Act, the reviewing court "must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." ***Craig v. Chater***, **76 F.3d 585, 589 (4th Cir. 1996); 42 U.S.C. § 405(6) (2001).** Substantial evidence is defined as that which "'a reasonable mind might accept as adequate to support a conclusion.'" ***Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (other citations omitted).** "'It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" ***Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)); *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).** If there is sufficient evidence to withstand a motion for a directed verdict had the case been before a jury, then the evidence is substantial and the ALJ's decision may not be overturned. ***Id.*** "It is not our place either to weigh the evidence or to substitute our judgment for that of the Secretary if that decision was supported by substantial evidence." ***Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456**

---

employed for a required number of quarters. The Supplemental Security Income Program (SSI), established by enactment of Title XVI of the Social Security Act as amended, 42 U.S.C. § 1381 *et seq.,* provides benefits to qualifying persons that are indigent and disabled. ***Craig, supra*, at 589 n.1.**

**(4th Cir. 1990)).** Thus, the issue for resolution here "is not whether [Plaintiff] is disabled, but whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." ***Craig, supra.***

Each party has moved for summary judgment, claiming they are entitled to judgment as a matter of law. Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. **Fed. R. Civ. P. 56(c).** A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).**

Where the parties have cross-moved for summary judgment, the Court will consider each motion separately. Thus, in considering the Plaintiff's motion, Plaintiff as the moving party has an initial burden to show a lack of evidence to support Defendant's case. ***Shaw, supra* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).** If this showing is made, the burden then shifts to the Defendant who must convince the Court that a triable issue does exist. ***Id.*** Such an issue will be shown "if

the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* After consideration of the Plaintiff's motion, the same procedure is used in connection with Defendant's motion for summary judgment.

Thus, in considering the facts of the case for purposes of these cross-motions, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).**

## II.  PROCEDURAL HISTORY

Plaintiff filed for Supplemental Security Income (SSI) in February 2004 alleging an onset of disability of June 29, 2001.[2] **Transcript of Proceedings ("Tr."), filed May 30, 2007, at 47, 64.**  His claim was denied

---

[2] The ALJ's decision and Plaintiff's memorandum state that Plaintiff's alleged onset of disability was July 14, 1994. *See* **Tr., at 12; Plaintiff's Memorandum of Law, filed June 27, 2007, at 1.** The undersigned finds no support for this date in the record before the Court. *See* **Defendant's Memorandum in Support of Commissioner's Decision, filed August 22, 2007, at 47 ("Plaintiff alleged that he had been disabled since June 29, 2001.").** Plaintiff filed previously for SSI and was denied benefits on October 31, 2003. **Tr., at 64.**

initially on September 13, 2004, and again upon reconsideration on January 6, 2005. ***Id*., at 24, 29.** Plaintiff filed a timely written request for a hearing on February 7, 2005. On May 17, 2006, a hearing was held before an ALJ in Hickory, North Carolina, where Plaintiff was present with counsel and testified on his behalf. ***Id*. at 33, 329.**

On September 11, 2006, the ALJ filed his decision finding Plaintiff was not disabled within the meaning of § 1614(a)(3)(A) of the Social Security Act. ***Id*. at 20; *see*  42 U.S.C. § 423(d)(1)(A).** The Plaintiff then requested review of the ALJ"s decision on November 15, 2006; the Appeals Counsel denied his request by notice dated February 9, 2007. **Tr., at 9, 5.** Plaintiff timely filed this action for judicial review on March 29, 2007. He has exhausted all of his administrative remedies and this case is ripe for review. ***See* 42 U.S.C. § 405(g).**

## III.  FINDINGS OF FACT

The Plaintiff alleges he has been disabled since June 29, 2001, and he has not engaged in substantial gainful activity since that time. **Tr., *supra*, at 47, 64; *see* 20 C.F.R. §§  416.920(b); 416.971 *et seq*.** Testimony given by Plaintiff during the disability hearing and Plaintiff's

medical records, accepted into evidence by the ALJ during the hearing,
show that Plaintiff had complained of a combination of back, neck and leg
pain prior to filing for benefits in 2001 and had described symptoms of
depression and anxiety secondary to this pain.  Plaintiff was born May 2,
1966, and was 40 years old at the time of his hearing.  *Id.* **at 332.**  He
reached the ninth grade in school; he never obtained a high school
equivalency or GED or received any additional education or training. *Id.*
He testified he quit school because he "just couldn't learn." *Id.* **at 333.**
Plaintiff testified he has not worked or looked for work since 2001.  *Id*. **at
333-34.**  Plaintiff testified at the hearing that although his wife drives most
of the time, he drives to the grocery store and to medical appointments.  *Id*.
**at 332-33**, **340**.  In the past, Plaintiff performed some car and motorcycle
repair and testified he learned how to do this from working alongside his
father and that most of his experience was limited to providing a tune up or
a brake job.  *Id.* **at 335.**  Plaintiff testified his previous employment included
installing vinyl siding and operating heavy equipment.  *Id.* **at 334.**  For
several years, Plaintiff did not work outside the home because he was
taking care of his mother, who had significant health problems, on a full-

time basis. *Id.* **at 336.** Plaintiff cooked for her and did some farm work. *Id.*

Plaintiff testified he had been diagnosed with spasmodic torticollis[3] which caused him significant pain. He testified that his muscles pulled sideways from his neck to his buttocks and that such pulling caused constant headaches. *Id.* **at 337.** He said he could not stand up for more than an hour at a time and had to lay down three or four times a day because of the pain. *Id.* He testified the pain prevented him from doing yard work or any significant housework other than to wash dishes for five minutes at a time and that most of the time his wife has to put his shoes and socks on because he is unable to do so. *Id.* **at 337-340, 341.** He testified that he was able to play with his grandchildren outside for thirty minutes on occasion and then he would lay down because of the pain. *Id.* **at 343.** Plaintiff testified he had been receiving botox injections roughly every three months over the past two years and the injections eased his pain for a couple of months at a time. *Id.* **at 337.** Plaintiff testified that he

_____

[3] "[A] contracted state of the cervical muscles, producing twisting of the neck and an unnatural position of the head . . . due to intermittent . . . spasms of neck muscles[.]" ***Dorland's Illustrated Medical Dictionary*** **1723 (28th ed. 1994).**

had other health problems but that they did not keep him from working and he identified the pain and pulling in his neck and back as the main reason for his inability to work. *Id*. **at 338.**

The medical evidence submitted by Plaintiff shows that he has seen a number of different treatment providers – some doctor visits related to the pain he has identified and some visits to providers in connection with this appeal.

On March 2, 2001, Dr. Thomas Kennedy conducted a lumbar myelogram procedure which showed a normal post-myelogram spine. *Id.* **at 105.** Dr. Kennedy found that slight aysmmetry revealed by the procedure raised the question of a lateral disc protrusion but otherwise there were no disc protrusions or disc herniations identified. *Id.*

On June 26, 2001, Dr. Timothy Gallagher performed a neurological scan and found no evidence of an abnormality and concluded the bone scan was normal. *Id.* **at 104.**

Plaintiff presented to Dr. Scott Duncan on March 5, April 9, August 8, and August 22, 2002, complaining of neck and back pain. *Id.* **at 107-128.** During the March 5 visit, Dr. Duncan found as part of Plaintiff's medical history that he had received excellent relief from lower back pain following

facet injections in the lumbar region.  *Id.* **at 119.**  Dr. Duncan began a course of treatment for Plaintiff's complaints that included radiofrequency procedures and a prescription for OxyContin for pain.  Plaintiff reported neither the procedure nor the pain medication eased his symptoms.  *Id.* During the August 8 and 22 examinations of Plaintiff, Dr. Duncan again provided treatment for neck and back pain.  *Id.* **at 109-115.**  Dr. Duncan performed cervical epidurals which provided Plaintiff with no pain relief. Even though Plaintiff remained on the pain medication, he reported that it had little effect on his reported symptoms.  *Id.*

As part of the treatment for his symptoms, Dr. Duncan referred Plaintiff to radiologists for procedures that included radiofrequency and Magnetic Resonance Imaging ("MRI") examinations.  Radiologists examined Plaintiff on April 4, May 15, and September 7, 2002.  *Id.* **at 123, 129-134.** The radiofrequency probe administered by Dr. Martin Black on April 9, 2002, revealed a lumbar spine with no fractures or bony destructive process and no significant deformity or disc space narrowing.  *Id.* **at 123.** The MRI performed by Dr. Jason Smith, on May 15, 2002, revealed minimal disc bulging at the C3-4 level, but otherwise Dr. Smith concluded there existed "[m]inimal spondylosis within the cervical spine, with no

evidence of central spinal stenosis or nerve impingement."[4]  *Id.* **at 131.**
Plaintiff's MRI exam performed on September 7, 2002, by Dr. Keith
Olbrantz, revealed no disc protrusions or spinal stenosis at any level.  *Id.*
**at 129-30.**

Plaintiff received treatment through Family Medical Associates from
February 2002 to November 2003.  *Id.* **at 165-194.**  Plaintiff reported a
history of neck and back pain and depression/anxiety and indicated he was
prescribed a variety of medications including OxyContin and Valium for the
pain and Celexa for the depression/anxiety.  *Id.*  Treating physicians
continued Plaintiff on medications for neck and back pain and
depression/anxiety.  *Id.* Dr. John Demsky referred Plaintiff to Southeast
Pain Care based on continued complaints of a combination of neck, back
and leg pain. *Id.* **at 203.**

Plaintiff presented to Southeast Pain Care on February 6, 2003, and
provided medical records detailing treatment from four previous pain
clinics.  *Id.*  As a prerequisite for treatment through Southeast, Plaintiff
signed a narcotic contract wherein he agreed not to receive narcotic

---

[4] Spondylosis is a general term describing degeneration due to
osteoarthritis.  ***Dorland's, supra,* at 1563.**

medications from other physicians while under Southeast's care. *Id*. **at 195**. Dr. Felix Muniz examined Plaintiff and reviewed his extensive medical history detailing the numerous medical procedures administered to Plaintiff following complaints of lower neck, back and leg pain. *Id*. **at 204.** This medical history included records from Dr. Scott Duncan and Dr. James Patton. During the examination, Plaintiff reported his severe back pain began in August 2000. He provided history during the exam that he previously worked in construction until June 29, 2001, and since that time, the alleged onset of disability, he had not worked. *Id.* Plaintiff stated he attended high school but dropped out and never obtained a GED and he reported problems reading, writing and understanding. *Id.* During the physical exam, Plaintiff reported he could ambulate with no assistive devices and Dr. Muniz noted Plaintiff walked with a gait favoring his left side. *Id*. **at 203.** Plaintiff demonstrated he was able to stand and walk on his heels and toes and his deep tendon reflexes were intact in his lower extremities. *Id.* Dr. Muniz found Plaintiff's motor function intact in all groups of muscles in his lower extremities. *Id.* In flexing his spine 90 degrees, Plaintiff reported increased bilateral back pain in the lumbar spine and displayed some tenderness following palpatation of the lower lumbar

spine.  *Id.*  During the straight leg exam, Plaintiff tested negatively bilaterally in both the sitting and supine position.  *Id.*  Dr. Muniz noted in his assessment that Plaintiff's case was not an easy case of regular back pain and opined spondylosis might not be the problem because it appeared minimal.  Based on these conclusions, Dr. Muniz suspected possible diskogenic pain and referred Plaintiff for a diskogram.[5] *Id.*

On April 16, 2003, Plaintiff underwent a diskogram administered by Dr. Thomas Heil, from Southeast Pain Care.  *Id.* **at 199.**  From the results of the procedure, Dr. Heil concluded the lower lumbar discs examined were non-painful and found mild nuclear and annular degeneration.  *Id.*

On May 2, 2003, Dr. Joseph Miller from Southeast Pain Care examined Plaintiff.  *Id.* **at 198.**  Dr. Miller reviewed Plaintiff's medical records and found that all of the medical procedures related to examination and treatment of Plaintiff's lower back pain and lower extremity pain showed minimal findings.  Plaintiff denied suffering from any weakness during the examination.  *Id.*

The last record from Southeast Pain Care included in the record is dated November 4, 2003, and shows that Dr. Miller informed Plaintiff that it

---

[5] "[A] radiograph of an intervertebral disk."  ***Dorland's, supra,* at 492.**

was a violation of the narcotic contract to receive any narcotic pain medications from any other physicians while being treated by Southeast. *Id*. **at 196.** Plaintiff denied that he had done so. *Id.* Dr. Miller phoned Plaintiff's pharmacy and learned Plaintiff received a prescription for OxyContin on August 13, 2003, and October 9, 2003, from Dr. Demski. *Id.* On August 19, 2003, Plaintiff received a prescription for Percocet from Dr. Owens. *Id.* Dr. Miller recommended Plaintiff be discharged as a patient from Southeast Pain Care for violation of the narcotic contract signed by Plaintiff. *Id.* Plaintiff received a letter dated November 6, 2003, confirming his discharge from treatment from Southeast Care for violation of the narcotic contract. *Id*. **at 195.**

On February 16, 2004, Plaintiff presented to Hildebran-Icard Family Medical Care Center complaining of lower back and leg pain and pain in his left side. Dr. Joseph Consing examined Plaintiff and took his medical history. *Id*. **at 234**. Plaintiff complained of severe lower back pain persisting over the last four years. Plaintiff stated his back pain may have resulted from a four wheeler accident where the equipment landed on his back. *Id*. Plaintiff reported taking OxyContin, Valium and Celexa on a daily basis. During the examination, Plaintiff walked without limitations or

significant limping and he could bend forward 90 degrees.  Dr. Consing noted Plaintiff's stature was erect and his deep tendon reflexes were normal bilaterally without any limitations or weaknesses.  *Id*. **at 235.**  To further assess Plaintiff's condition, Dr. Consing referred Plaintiff for an MRI.  *Id.* **at 236.**  The MRI, performed on February 28, 2004, by Dr. Keith McMurdo, revealed some minimal diskogenic changes in the bone marrow of the lumbar spine suggesting very mild early degenerative disk disease.  The exam revealed no evidence of disc protrusion or herniation.  *Id*. **at 231-33***.* Dr. McMurdo concluded the remainder of the exam was normal with no evidence of disk herniation or spinal stenosis.  *Id*.

On June 27, 2004, Plaintiff received a psychological evaluation performed by John Bevis, M.A., L.P.A.  *Id*. **at 237.**  Plaintiff reported he dropped out of high school in the tenth grade and was in special education classes at the time.  Mr. Bevis noted Plaintiff walked with a moderate left leg limp, but was well oriented and engaged in relevant, organized dialogue.  *Id*.  Plaintiff reported he drove himself to the examination and that he came alone.  *Id*.  Plaintiff described previously working in the construction industry until he quit in 2001 because of chronic pain in his back and legs.  *Id.*  He reported previous work installing vinyl siding and

windows prior to joining the construction industry and he also took care of his mother in her home for several years at which time he did not have a job outside the home. *Id.* Plaintiff described a history of depression secondary to the chronic neck and back pain. *Id*. Mr. Bevis administered the KaufmanTest of Educational Achievement and conducted an extensive interview of Plaintiff. *Id.* **at 239**. Mr. Bevis concluded Plaintiff functioned within the borderline range of intelligence, was capable of understanding and following simple instructions, and demonstrated an adequate attention span to perform simple, repetitive tasks. *Id*. Mr. Bevis opined Plaintiff appeared capable of relating to fellow workers and supervisors under normal conditions and, although his tolerance for stress could interfere with his work performance, Plaintiff appeared capable of managing his personal, financial and business affairs without the need for assistance. *Id*. **at 239-40.**

On September 24, 2004, Plaintiff presented to Dr. James Patton, complaining of neck and back pain. *Id.* **at 247.** During Plaintiff's physical exam, Dr. Patton noted Plaintiff's neck was tender, he had a decreased range of motion and made the diagnosis of spasmodic torticollis. *Id*. Following the physical exam, Dr. Patton performed a needle

electromyography procedure and noted bursts of activity in the cervical region and concluded these bursts of activity were consistent with a cervical dystonia spasmotic torticolli. *Id*. A botulinum toxin type A ("botox") injection was given to ease the symptoms from Plaintiff's neck pain. *Id*. Dr. Patton prescribed Percocet and Flexeril and recommended Plaintiff return for a follow-up in three to four months. *Id.* Dr. Patton examined Plaintiff again on January 7, 2005, and conducted another needle electromyography procedure. He again noted that the resulting bursts of activity in the cervical region was consistent with cervical dystonia/spasmodic torticolli. *Id*. **at 245.** Another botox injection was administered and Plaintiff was to return for follow-up examination in three to four months. *Id*. **at 245**. Plaintiff returned to Dr. Patton for the follow-up exam on April 15, 2005, and the same procedures were repeated. *Id*. **at 243.** That same day, Dr. Patton wrote a letter on Plaintiff's behalf stating that Plaintiff was his patient and suffered from severe muscle spasms, torticollis, and chronic neck and back pain. *Id*. **at 244.** As a result of these medical problems, Dr. Patton concluded Plaintiff was completely and totally disabled and unable to maintain any gainful employment. *Id.* Based on the April 15, 2005 examination, Dr. Patton completed a "Medical Statement

Regarding Spasmodic Torticollis for Security Disability Claim" ("form") for

Plaintiff on April 22, 2005. On the form, Dr. Patton stated Plaintiff suffered

from severe pain that limited him to working one hour per day, standing 15

minutes at a time, sitting 15 minutes at a time and left him unable to lift any

weight on either a frequent or occasional basis. *Id.* **at 241.** Additionally,

Dr. Patton noted Plaintiff could not rotate his neck to the left or right,

elevate his chin or lower his chin to his neck. *Id.* Dr. Patton stated on the

form that he provided treatment for Plaintiff's pain and spasms by

administering botox injections and pain medication, but that these

measures had provided only minor relief from pain and spasms. *Id*.

Plaintiff presented to Dr. Patton for examination on July 25 and

October 26, 2005, and on January 17, 2006. *Id*. **at 299-304.** During each

visit, Plaintiff underwent the needle electromyography procedure on his

cervical region and bursts of activity were noted by Dr. Patton and held

consistent with cervical dystonia/spasmotic torticollis. *Id*. Plaintiff

continued botox injections and Dr. Patton reported the injections were

beneficial. *Id.* Dr. Patton found Plaintiff continued to receive substantial

benefit from the botox injections, that he was doing very well with these

injections, and the injections were improving Plaintiff's quality of life. *Id*. **at**

**299-303.** Plaintiff reported during the January 27, 2006, exam that "[t]he last injection helped me more than any before." *Id.* **at 299**.

## IV. DISCUSSION

Disability under the Social Security Act means the inability to engage in any substantial gainful activity due to a physical or mental impairment expected to result in death or to last for a continuous period of not less than twelve months. In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. *See,* **20 C.F.R. § 416.920.** If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. *Pass v. Chater***, 65 F.3d 1200, 1203 (4th Cir. 1995).** The claimant "bears the burden of production and proof during the first four steps of the inquiry." *Id.* **(citing** *Hunter v. Sullivan***, 993 F.2d 31, 35 (4th Cir. 1992)).** If the claimant carries his or her burden through the fourth step then "the burden shifts to the Secretary in the fifth step to show that other work is available in the national economy which the claimant could perform." *Hunter***, 993 F.2d at 35.**

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education,

or work experience of the applicant. ***Pass, supra.*** Second, the applicant must show a severe impairment. If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled. ***Id.*** Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience. ***Id.*** Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. ***Id.*** Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. ***Id.*** In this case, the ALJ's determination was made at the fifth step.

In his brief supporting summary judgment, Plaintiff submits only one issue for the Court's consideration in his challenge to the decision of the

ALJ that Plaintiff was not disabled.  Plaintiff argues the ALJ erred in not

calling a vocational expert because Plaintiff had a significant nonexertional

impairment and thus could not perform a full range of medium work.

**Plaintiff's Memorandum of Law,** *supra,* **at 3.**  This issue requires the

Court to consider whether the finding of nonexertional impairment(s)

required the ALJ to call a vocational expert to testify whether the national

economy offered sufficient employment opportunities or whether the ALJ

properly relied on the medical-vocational guidelines in determining there

were sufficient jobs for Plaintiff in the national economy.  **Tr., at 9**.

A nonexertional impairment is defined as limitation(s) or restriction(s)

which affects the claimant's ability to meet the demands of jobs other than

strength demands.  **20 C.F.R. § 416.969a(a)**.  Examples of nonexertional

limitations include anxiety, nervousness and depression.  **20 C.F.R. §**

**419.969a(c).**  An exertional impairment is defined as limitation(s) that affect

the claimant's ability to meet the strength demands of a job.  **20 C.F.R. §**

**419.969a(a).**

The Supreme Court has considered the issue of whether the

Commissioner could rely on published medical-vocational guidelines

("guidelines" or "grids") to determine a claimant's right to Social Security

benefits.  **Heckler  v. Campbell, 461 U.S. 458 (1983).**  The Court

concluded that the Commissioner could properly rely on the guidelines in

certain cases.  **Id. at 467.**  The guidelines "provide an ALJ with

administrative notice of classes of jobs available in the national economy

for persons who have, among other things, certain disability characteristics

such as strength or exertional limitations."  **Coffman v. Bowen, 829 F.2d

514, 518 (4th Cir. 1987)**; **see 20 C.F.R. § 404.1566(d).**  The grid table

considers

> [t]he strength or "exertional" component of the claimant's
> disability in determining whether jobs exist that the claimant is
> able to perform in spite of his disability.  For that reason, the
> regulations themselves specifically provide that where the
> claimant's impairment is nonexertional – not manifested by a
> loss of strength, or other physical abilities – or is marked by a
> combination of exertional and nonexertional impairments, the
> grids' Rules are not conclusive, and full individualized
> consideration must be given to all relevant facts of the case.  In
> particular, the regulations note that individualized consideration
> must be given when nonexertional impairments further narrow
> the range of jobs available to the claimant, considering his
> exertional impairments.

**Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983) (citing 20 C.F.R.,

Part 404, subpart P, Appendix 2, § 200.00(a), (d)-(e); 20 C.F.R. §

404.1569; § 200.00(d)(2)).**  In the instant case, the ALJ found Plaintiff

suffered from the severe exertional impairment of degenerative disc

disease as defined by 20 C.F.R. § 416.920(c).  **Tr.,** *supra***, at 14**.  The ALJ

also found Plaintiff suffered mental impairments that resulted in more than

mild limitations and that these rose to the level of a severe nonexertional

impairment.  *Id.*  Plaintiff cites *Grant* to support his argument that the ALJ

erred in failing to use a vocational expert when evidence presented

demonstrated Plaintiff suffered from severe exertional and nonexertional

impairments.  In *Grant*, the Court held that where a claimant

> demonstrates the presence of nonexertional impairments, the
> Secretary, in order to prevail, must be required to prove by
> expert vocational testimony that, despite [the claimant's]
> combination of nonexertional and exertional impairments,
> specific jobs exist in the national economy which he can
> perform. The grids may satisfy the Secretary's burden of
> coming forward with evidence as to the availability of the jobs
> the claimant can perform only where the claimant suffers solely
> from exertional impairments.

***Grant, supra.***

The Fourth Circuit examined the holding in *Grant* in deciding an issue

largely indistinguishable from the issue presented by the Plaintiff here.

***See Smith v. Schweiker***, **719 F.2d 723 (4th Cir. 1983).**  The claimant in

*Smith* argued that "because he suffer[ed] from 'nonexertional impairments'

in combination with his exertional impairments, the grid regulations [could

not] be controlling, but instead the Secretary must prove by specific

vocational evidence that [claimant] [could] perform jobs in the national economy." *Id.* **at 725.** The ALJ's determination that Smith was not disabled "flowed from a straightforward application of the 'grid regulations'" even after he "introduced evidence that he suffered from anxiety and depression in addition to his physical ailments." *Id.* **at 723-24.** The Court found substantial evidence supported the Secretary's finding that the claimant's "nonexertional maladies did not significantly affect his ability to perform work of which he was exertionally capable." *Id.* **at 724.** Smith suffered from "physical infirmities, the primary one being progressive deterioration of his left hip joint which cause[d] him pain in walking any distance and prevent[ed] his stooping or lifting heavy objects." *Id*. Smith underwent a psychiatric examination and the ALJ summarized the doctor's report:

> [Smith's] conversation was coherent and relevant and his mental activity was alert and his orientation was good. His intellectual function showed no deficits in memory or other aspects of performance. His mood appeared to be mildly depressed and his affect was anxious, as reflected in his tense manner of speech, voluble recitation of physical symptoms and a slight tremor. He displayed no evidence of psychosis such as delusions, ideas of reference, or paranoid ideation. The diagnosis was anxiety neurosis. . . . From an emotional standpoint, he suffers from a good deal of tension and anxiety as well as depression. He has not received specific treatment for his emotional state which does not appear to produce

significant social, personal, or occupational regression in itself. However, combined with the physical symptoms, it would appear that his anxiety has an additive effect. It was the [doctor's] opinion that from a strictly emotional viewpoint, [Smith] does not have a mental impairment so severe that he is unable to engage in substantial gainful activity but "that his disability should be determined strongly on a physical basis in combination with the added stress of his anxiety."

*Id.*

In holding that *Grant* was not controlling under the facts presented in *Smith*, the Circuit found that the "proper inquiry, under *Grant*, is whether a given nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. If the condition has that effect, it is properly viewed as a 'nonexertional impairment,' thereby precluding reliance on the grids to determine a claimant's disability." *Id.* at 725; *See also Bapp v. Bowen*, **802 F.2d 601, 605 (2d Cir. 1986) (the need for expert testimony is determined on a case-by-case basis and depends on whether the nonexertional limitation significantly diminishes the range of work permitted by exertional limitation);** *Tucker v. Heckler*, **776 F.2d 793, 796 (8**[th]** Cir. 1985) ("Where, as here, the ALJ properly determines that the claimant's nonexertional impairments do not prevent the claimant from performing the full range of work contemplated by the**

**Guidelines, the ALJ may rely on the Guidelines in directing a determination of 'not disabled' without resort to vocational expert testimony or other similar evidence to establish the claimant's ability to perform work in the national economy."); *Hernandez v. Heckler*, 704 F.2d 857, 863 (5th Cir. 1983) (when evidence supports the ALJ's finding that plaintiff's nonexertional impairments do not limit his ability to perform sedentary work, the guidelines were properly applied).**

The ALJ in *Smith* made a specific finding that the claimant's anxiety neurosis did not affect "his capacity to perform sedentary work."  ***Smith, supra.***  The Court concluded that the ALJ's decision was supported by competent evidence and "it was not improper to apply the grids in determining Smith's disability status." ***Id.***

In applying the holding of *Smith* to the instant case, it is necessary to consider the ALJ's findings that Plaintiff had the residual functional capacity to stand/walk/sit for 6 hours out of an 8-hour workday, lift/carry 50 pounds occasionally and 25 pounds frequently, push/pull 50 pounds occasionally and 25 pounds frequently, with no complex/detailed tasks, and was mentally capable of performing unskilled work activity.  **Tr., *supra*,**

**at 14, 20**.  In sum, the ALJ found at step five that Plaintiff had the residual functional capacity "for the full range of medium work, considering the [Plaintiff's] age, education, and work experience[.]"  *Id.* **at 20.**  The Regulations provide the "functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work.  **20 C.F.R., Part 404, Subpart. P, Appendix 2, § 203.00.**  The Regulations define residual functional capacity as the most a claimant can do in a work setting despite their limitations.  **20 C.F.R. § 404.1545(a)(1).**

Critical to this Court's review is the fact that the ALJ made a specific finding that Plaintiff's mental impairment "does not significantly affect his ability to perform the basic requirements of medium work and would not significantly erode the occupational base of medium work."  **Tr.,** *supra***, at 20.**  The question of whether "a given nonexertional condition affects a particular claimant's residual capacity to engage in certain job activities is a question of fact."  *Smith***,** *supra***;** *see also Cummins v. Schweiker***, 670 F.2d 81, 84 (7th Cir. 1982) (question whether nonexertional condition interfered with claimant's ability to perform sedentary work was factual).**  The ALJ's finding is reviewed by this Court to determine whether the finding is supported by substantial evidence.  *Smith***,** *supra***;** *Craig***, 76**

**F.3d at 589.**  After careful review of the record in this case, the Court determines that the ALJ's findings are supported by substantial evidence.

Plaintiff underwent a psychological examination in connection with his application for SSI with Mr. John H. Bevis.  **Tr.,** ***supra*****, at 18, 237-40.** Mr. Bevis described Plaintiff's depression as "moderate."  Mr. Bevis found Plaintiff demonstrated "good reality contact and was alert and responsive during the evaluation process.  He ambulated without assistance but with a noticeable left leg limp." ***Id.* at 238.**   His speech was clear with a normal tempo and his thought process was "coherent and goal-directed." ***Id****.* Plaintiff denied suicidal or homicidal thoughts and Mr. Bevis reported no notice of delusions or unusual suspicions. ***Id.***  He was "well oriented to time, person, place, and situation." ***Id.***  Mr. Bevis concluded Plaintiff was within the borderline range of intelligence, "was capable of understanding and following simple instructions," and "[h]is attention span was adequate to perform simple, repetitive tasks." ***Id.***  In addition, Mr. Bevis found Plaintiff was capable of relating to fellow workers and supervisors." ***Id.***  It was noted that Plaintiff's "tolerance for stress and pressure associated with a work routine may interfere with his work performance." ***Id.* at 240**. However, Mr. Bevis ultimately concluded Plaintiff appeared capable of

managing his personal, financial , and business affairs without the assistance of others. *Id.*

In connection with his claim for SSI, Dr. W. Henry Perkins completed a Mental Residual Functional Capacity Assessment on September 10, 2004. **Tr., at 263-66.** Dr. Perkins found Plaintiff was able to understand and remember simple three-step directions; had some deficits in sustained concentration, but would be able to sustain sufficient attention to complete simple routine tasks for a two hour period at a non-production pace; that he would be able to accept direction from a supervisor and maintain adequate relationships with co-workers; and that Plaintiff could function with a stable work assignment. *Id*. **at 265.**

The ALJ found, citing Social Security Ruling 85-15, "the basic mental demands of competitive, remunerative, unskilled work include the abilities to understand, carry out and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations[.]" *Id.* **at 20; SSR 85-15.** The ALJ concluded Plaintiff was mentally capable of performing unskilled medium work and that his mental impairment did not significantly erode the occupational base of medium work. **Tr.,** *supra.*

After finding that Plaintiff had the residual functional capacity to perform a full range of medium work, the ALJ consulted the grids and concluded there existed significant numbers of unskilled jobs in the national economy that Plaintiff could perform.  *Id***. at 19**.  Plaintiff, age 35 on the date the SSI application was filed and 40 years old at the time the ALJ rendered a decision, is defined as a younger individual under the Regulations.  A younger individual is an individual between the years of 18 and 49.  **20 C.F.R. , Part 404, Subpart P, Appendix 2, § 201.00(h)(1).**  In examining Table No. 3 from the Grids, a finding that Plaintiff is not disabled is directed based on his limited education and his past work experience, whether considering his past unskilled work or even assuming no past work experience. The Grid demonstrates there are approximately 2,500 separate sedentary, light, and medium occupations existing in the national economy which do not require skills or previous work experience.  *Id***., at § 203.00**.  The ALJ's conclusion that Plaintiff's nonexertional impairment does not impact his ability to perform medium unskilled labor and that there exists a significant number of jobs in the national economy that Plaintiff could perform is supported by substantial evidence.  **Tr.,** *supra***, at 20.**

# V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for summary judgment is **DENIED,** and the Defendant's motion for summary judgment is hereby **ALLOWED**.  A Judgment affirming the Commissioner's decision denying benefits to the Plaintiff is filed herewith.

Signed: January 29, 2008

Lacy H. Thornburg
United States District Judge